## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RICHARD and SUSAN KREIBICH, h/w<br>2100 Laguna Vista Drive<br>Novato, CA 94945 : | :<br>:<br>:<br>:    CIVIL ACTION<br>: |
|         Plaintiffs, : | :    Case No.    2:14-cv-05102-ER<br>: |
|   vs. : | :<br>:    **JURY TRIAL DEMANDED** |
| DAVID CALLAN<br>159 North State Street<br>Newtown, PA 18940 : | :<br>:<br>:<br>: |
| HWC, LLC<br>159 North State Street<br>Newtown, PA 18940 : | :<br>:<br>:<br>: |
| HAWK MANAGEMENT L.P.<br>159 North State Street<br>Newtown, PA 18940 : | :<br>:<br>:<br>: |
| HAWK OPPORTUNITY FUND, L.P :<br>159 North State Street<br>Newtown, PA 18940 : | :<br>:<br>: |
| and : | :<br>: |
| PLAYA DULCE VIDA, S.A.<br>159 North State Street<br>Newtown, PA 18940 : | :<br>:<br>:<br>: |
|         Defendants. : | : |

# FIRST AMENDED COMPLAINT

Plaintiffs Richard Kreibich and Susan Kreibich bring this action against Defendants David Callan, HWC LLC, Hawk Management L.P., Hawk Opportunity Fund, L.P., and Playa Dulce Vida, S.A. (collectively "Defendants") for breach of contract, alter ego liability/piercing the corporate veil, breach of the implied covenant of good faith and fair dealing, conversion, tortious interference with contract, promissory estoppel, fraud/misrepresentation and fraud in the inducement.

## THE PARTIES

1.    Plaintiffs Richard Kreibich and Susan Kreibich (collectively the "Kreibichs" or "Plaintiffs"), husband and wife, are citizens of the State of California, maintaining a principal residence at 2100 Laguna Vista Drive, Novato, California 94945.

2.    Defendant David Callan ("Callan") is an individual and citizen of the Commonwealth of Pennsylvania, maintaining a principal place of business at 159 North State Street, Newtown, Pennsylvania 18940.  Upon information and belief, Callan is also a full-time resident of the Commonwealth of Pennsylvania.

3.    Callan is a fifty percent (50%) member of Defendant HWC LLC ("HWC") and, together with non-party Richard Scott Williams ("Williams"), Callan controls and directs HWC and beneficially owns fifty percent of all securities that

HWC owns. Upon information and belief, Williams is also a full-time resident of the Commonwealth of Pennsylvania.

4.     Defendant HWC is a Delaware limited liability company, formed on August 13, 2004 and maintaining its principal place of business at 159 North State Street, Newtown, Pennsylvania 18940.

5.     HWC is owned, operated, directed and controlled solely by Defendant Callan and non-party Williams.

6.     HWC is the general partner of Defendant Hawk Management L.P. ("Hawk Management") and is the beneficial owner of all securities that Hawk Management owns.

7.     Hawk Management is a Delaware limited partnership, formed on August 13, 2004 and maintaining its principal place of business at 159 North State Street, Newtown, Pennsylvania 18940.

8.     Defendant Callan and non-party Williams are the sole limited partners of Hawk Management.

9.     Therefore, Hawk Management is owned, operated, directed and controlled by Defendant Callan and non-party Williams, who own all of its limited partnership interests and jointly own and control its general partner.

10.    Hawk Management is the general partner of Defendant Hawk Opportunity Fund ("HOF"), with day-to-day operational control and full and

exclusive authority and responsibility over HOF. *See* November 1, 2004 Hawk Opportunity Fund L.P. Confidential Private Placement Memorandum, excerpted in relevant portion at **Exhibit A** at pp. 5, 16 & 26 ("Hawk Management L.P., a Delaware limited partnership, will act as the general partner to the [HOF] Fund. The General Partner has full and exclusive discretionary authority and responsibility to manage the day-to-day operations of the [HOF] Fund and to invest and reinvest its assets. Hawk will provide investment management services to the fund. . . . Management and control of the business and operations of the [HOF] Fund are vested exclusively in the General Partner. . . . The success of the [HOF] Fund is significantly dependent on the expertise of David S. Callan . . .") (parentheticals omitted).

11.     HOF is a Delaware limited partnership, maintaining its principal place of business at 159 North State Street, Newtown, Pennsylvania, 19840.

12.     Thus, HOF is managed and operated by its general partner and investment manager, Hawk Management, which is owned and controlled exclusively by Defendant Callan and non-party Williams.

13.     Defendant Playa Dulce Vita, S.A. ("PDV") is a corporation organized and existing under the laws of the nation of Costa Rica with an address in care of Defendant Hawk Management, 159 North State Street, Newtown, Pennsylvania

18940. Upon information and belief, PDV has never officially registered to do business in Costa Rica.

14. Defendant PDV owns and operates a boutique hotel in Manuel Antonio, Quepos, Puntarenas, Costa Rica, called Arenas del Mar Beachfront and Rainforest Resort (the "Hotel").

15. Defendant HOF owns a majority of the common shares of PDV, and thereby is the majority owner of the Hotel and controls the operations of the Hotel. *See* Hawk Opportunity Fund April 1, 2009 Executive Summary of Investment Portfolio, excerpted in relevant portion at **Exhibit B**, at p. 8 (representing HOF's seventy five percent (75%) equity ownership of the Hotel and development rights for expansion of the Hotel).

16. Defendant Callan is President of PDV. *See* Declaration of David Callan, attached hereto as **Exhibit C**, at ¶ 2.

17. Callan is also a member of PDV's Board of Directors (the "PDV Board"). *Id.*

18. As set forth above and further explicated below, Callan controls and directs the affairs of PDV and the Hotel from his office in Newtown, Pennsylvania, which is located within this District.

19. Further, as described in detail below and supported by evidence attached hereto, Defendant Callan has created legal fictions serving as alter egos

for himself and for one another, which are the Defendant entities HWC, Hawk Management, HOF and PDV.

20.    Through his ownership interests in and control over Defendants HWC, Hawk Management, HOF and PDV, as well as his positions as President of PDV, member of the PDV Board, and member of the PDV Executive Committee, Callan exerts dominion and control over PDV, although Callan attempts to mask his role in PDV through the corporate layers of HOF, Hawk Management and HWC.    These corporate formations have been erected to protect Callan from responsibility for the fraud he has perpetrated against Plaintiffs, by obscuring Callan's control over PDV and attempting to shield Callan from personal liability for his own bad acts.

## JURISDICTION AND VENUE

21.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the controversy is between parties that are deemed citizens of different states.

22.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) because Defendants reside in this District for purposes of venue, and a substantial portion of the events and omissions giving rise to this action occurred in this District.

23.     Specifically, the principal place of business for each of Defendants Callan, HOF, Hawk Management and HWC is Newtown, Pennsylvania, which is within this District.

24.     The wrongful and fraudulent acts complained of below were organized, orchestrated and executed from Callan's office in Newtown, Pennsylvania.

25.     In addition, this Court has specific personal jurisdiction over Defendant PDV, which, under the majority ownership, dominion and control of Defendant Callan, who used Defendants HOF, Hawk Management and HWC as his alter egos, purposefully directed its activities within the Commonwealth of Pennsylvania.

26.     Callan holds himself out to the public, including and in particular to residents of the Commonwealth of Pennsylvania, as one of two co-owners of the Hotel; the Hotel specifically advertises to and solicits residents of the Commonwealth of Pennsylvania by touting Callan as both an owner of the Hotel and a resident of the Commonwealth.

27.     The Hotel's website identifies Callan as a "Philadelphia-based co-owner" in advertising events involving the import of Philadelphia chefs to the Hotel. *See* "Culinary Tourism" sub-page, Arenas Del Mar webpage, attached hereto as **Exhibit D**.

28.     Every "world class chef" identified on the Hotel's "Culinary Tourism" page is a chef known for owning and/or operating a Philadelphia-area restaurant – including Kevin Sbraga (Sbraga, Fat Ham, Juniper Commons), Christina Rando (Franklin Mortgage Bar), Al Sotack (Franklin Mortgage Bar), Josh Lawlor (Farm and Fisherman), Chip Roman (Blackfish), Steve Howells (Blackfish), Jason Cichonski (Ela), Jen Carroll (10Arts) and Sean Weinberg (Alba) – and the website clearly targets those chefs' loyal customers and fans: "Arenas Del Mar's culinary program has been launched and Philadelphia chefs are benefitting as well as their own clients . . ." *Id.*

29.     In addition, thetowndish.com, a "hyper local" "foodie" online publication featuring sponsored lifestyle articles targeted at specific residential communities within the Commonwealth of Pennsylvania (Exton, Chester County, Manayunk, Main Line, Media, Phoenixville, Chestnut Hill and Downingtown) featured an article on August 13, 2014 entitled *Chester County Heads to Arenas Del Mar for Costa Rica Beer Week,* which article is attached hereto as **Exhibit E**.

30.     Therein, Callan was referenced as a "co-owner" of the Hotel, and two weeks of specially prepared meals by five well-regarded Philadelphia-area chefs in October and November of 2014 were trumpeted. *Id.*

31.     The article clearly serves as a marketing tool for the Hotel among Pennsylvania residents, and ends with a solicitation to readers: "Don't miss out on

this fabulous weeklong beer event. Make your reservations with Arenas Del Mar today." *Id.*

32.     A June 24, 2013 marketing article in *Philadelphia Business Journal* entitled "Chefs will give Philly flavor to tropical resort," attached hereto as **Exhibit F**, identifies Callan as both an owner of the Hotel and a Philadelphia resident, and states:

> Five Philadelphia chefs will pack their knives, so to speak, for appearances at a tropical resort.
>
> Arenas Del Mar, a 38-room luxury resort in Costa Rica, offers zip lines, deep-sea diving and natural beauty, but in coming months it will also have wine-and-rum tastings and chef-led culinary experiences.
>
> Two partners in the resort, Dave Callan and Jeremy Allen, are based in Philadelphia.

Ex. F pp. 1-2.

33.     A similar April 4, 2013 article on marketing website mediakitty.com, attached hereto as **Exhibit G**, identifies Callan as a "Philadelphia-based co-owner" of the Hotel, and touts the visits from Philadelphia chefs to potential customers: "word will spread [about the Hotel's culinary events] beyond Philadelphia's borders for future years, however for now Philadelphia chefs and their clients get the benefit!"

34.     Callan, on behalf of PDV, intentionally held himself out as a resident of the Commonwealth of Pennsylvania and as one of two co-owners of the Hotel to

fellow Pennsylvania residents, solicited investors for PDV from his offices in Newtown, Pennsylvania, communicated with existing and potential PDV investors from his offices in Newtown, Pennsylvania, attended managerial meetings regarding the Hotel's culinary operations at his home in the Commonwealth of Pennsylvania, hired renowned chefs *only* from the Philadelphia area to work at PDV's Hotel, advertised and marketed the Hotel's activities in targeted Philadelphia-area print and online publications, and directed significant activities of PDV, including development, financing and the management of culinary and other events, from his offices in Newtown, Pennsylvania. *See* Ex. D, E, F & G.

35.    By way of further illustration, on December 1, 2010, HOF posted on its website a self-authored article, which describes HOF's exertion of dominion and control over PDV. A true and correct copy of this article is attached hereto as **Exhibit H**.

36.    Therein, HOF – which is managed by its general partner Hawk Management, which, in turn, is owned and controlled by Callan's HWC entity – stated that it "agreed to advance funds [to PDV's developer] on a secured basis to build out condo units and as they were sold, be repaid funds advanced." Ex. H p. 1.

37.    When a shortfall resulted, HOF converted its secured interest into equity in PDV, and HOF's website represents that HOF "*now control[s] the equity*

*and management of the hotel* which has been appraised by the bank in excess of $20,000,000." *Id.* (emphasis supplied).

38. HOF's article also states that owners of condo units at the Hotel "known as preferred holders in CR [Costa Rica], have mostly been converted to equity." *Id.* As of the December 2010 date of the HOF article, upon information and belief, this statement was untrue.

39. However, on February 15, 2011, two months *after* the HOF article was posted on the HOF website, the Board issued a letter to preferred shareholders of PDV (the "Preferred Shareholder Letter") in which the Board solicited preferred shareholders to convert their preferred shares to common shares. A true and correct copy of the Preferred Shareholder Letter is attached hereto as **Exhibit I**.

40. The Preferred Shareholder Letter references conversations Callan personally held with investors in PDV from his Newtown, Pennsylvania offices. Ex. I p. 1 ("As you know from talking to Mr. Dave Callan or other members of our Board of Directors, the parent company of [the Hotel], Playa Dulce Vida, S.A., has been undergoing a transformation not only with the successful opening of the hotel but with an important ownership restructuring. This is a summary of your Board's efforts addressing both those issues.").

41. The Preferred Shareholder Letter also describes Callan's plans to control PDV through HOF, which, the Board specifically notes, is run out of

Pennsylvania. *Id.* at p 3 ("Our company Vice President, Mr. David Callan is a principal of a pooled investment fund in Pennsylvania, Hawk Opportunity Fund. Mr. Callan, who is the registered owner of preferred shares, has indicated to the Board that he and a group of other preferred shareholders will be exchanging into common stock and that they may turn over that stock into Hawk for management purposes. It is believed by the company that if this occurred, the majority of the company's common stock might be controlled by Hawk Opportunity Fund.").

42.     Upon information and belief, thereupon Callan, through his alter ego HOF, executed the described share conversion and thereafter has controlled the majority of PDV's common stock and exercised complete dominion and control over PDV from his principal place of business in Newtown, Pennsylvania.

43.     The Preferred Shareholder Letter provides shareholders with Callan's phone number, which contacts him at his office in Montgomery County, Pennsylvania. *See* Ex. I.

44.     The Preferred Shareholder Letter instructs preferred shareholders to convert preferred shares to common shares by completing a Stock Exchange Offer Form (the "Exchange Form," a copy of which is attached hereto as **Exhibit J**),

which must be returned to PDV's Corporate Secretary, Paul H. Lesniak ("Lesniak"), at 415 McFarlan Road, Suite 200, Kennett Square, Pennsylvania.[1]

45.     Therefore, based on Lesniak's duty to maintain PDV's official records, and his corporate address in Pennsylvania, Plaintiff believes that some or all of PDV's official records were and are, in fact, maintained in Pennsylvania, within the jurisdiction of this Court.

46.     As a result of PDV's deliberate and purposeful contacts with the Commonwealth of Pennsylvania, this Court has personal jurisdiction over PDV – and indeed over all Defendants.

47.     If a defendant "deliberately . . . has created continuing obligations between himself and residents of the forum, . . . he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by the benefits and protections of the forum's laws, it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well." *Cargill Cocoa & Chocolate, Inc. v. Abco Laboratories, Inc.,* Slip Op., No. 13-cv-06004, 2014 WL 4795028 at *10(E.D. Pa. September 26, 2014) (internal citations and quotations omitted).

---

[1] Lesniak served at various times not only as PDV's Corporate Secretary, but also as PDV's Chief Financial Officer, the Hotel's general manager, the PDV Board's secretary and a member of the PDV Board's Executive Committee.

48.     The instant litigation relates to PDV's activities in the Commonwealth of Pennsylvania insofar as it implicates Callan's solicitation of investments in and on behalf of PDV as well as solicitations to convert preferred shares of PDV stock to common shares, all of which solicitations were conducted from his offices within the Commonwealth; insofar as it arises out of the overt mismanagement of those investments in PDV and the fraudulent misrepresentation of the value of those investments in PDV, which acts were also carried out by Callan on behalf of PDV – by and through alter ego Defendants HOF, Hawk Management and HWC – from his offices in Newtown, Pennsylvania; and insofar as it alleges that the Defendants' acts in Pennsylvania resulted in the breach of Plaintiffs' contracts with PDV.

49.     Courts in the Third Circuit apply the substantive relevance test to jurisdictional issues in cases involving contract claims. *O'Connor v. Sandy Lane Hotel Co., Ltd.,* 496 F.3d 312, 318 (3d Cir. 2007) ("in contract cases we have effectively required substantive relevance."); *see also General Elec. Co. v. Deutz AG,* 270 F.3d 144, 150 (3d Cir. 2001) ("In contract cases, courts should inquire whether the defendant's contacts with the forum were instrumental in either the formation of the contract or its breach.").

50.     The substantive relevance test "examines whether any of the defendant's contacts with the forum are relevant to the merits of the plaintiff's claim." *Sandy Lane Hotel,* 496 F.3d at 318 (internal citations omitted).

51.     The Court's exercise of jurisdiction over the Defendants comports with fair play and substantial justice, as PDV has intentionally availed itself of and purposefully benefitted from customers, culinary purveyors, financial managers, controlling investors, majority owners, PDV Board members, corporate officers, and maintenance of corporate records located in and derived from the Commonwealth of Pennsylvania. Being haled into court in this jurisdiction is therefore not a hardship.

52.     The Third Circuit has held that it is a "rare case" where, in spite of the defendants' "at-least-minimal contacts with Pennsylvania, jurisdiction would be unfair or unjust." *Rantnetwork, Inc. v. Underwood,* No. 4:11–CV–1283, 2012 WL 1021326 at *8 (M.D. Pa. March 26, 2012) (citing *Pennzoil Prods. Co. v. Colelli & Assocs., Inc.,* 149 F.3d 197, 207 (3d Cir. 1998)); *see also, Colvin v. Van Wormer Resorts, Inc.,* 417 Fed. Appx. 183 (3d Cir. 2011) ("The existence of minimum contacts makes jurisdiction presumptively constitutional . . ."); *O'Connor v. Sandy Lane Hotel Co., Ltd.,* 496 F.3d 312, 325 (3d Cir. 2007) (citing *Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 114, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987)) ("[W]hen minimum contacts have been established, often the interests of the

plaintiff and the forum in the exercise of jurisdiction will justify even ... serious burdens placed on the ... defendant.").

53.     Therefore, venue and jurisdiction in this Court is proper.

## BACKGROUND

### Plaintiffs' Purchase of a Unit at the Resort

54.     In or about March of 2005, a mutual acquaintance introduced Plaintiffs directly and personally to Defendant Callan, who represented himself to be a licensed financial advisor.

55.     Plaintiffs were introduced to Callan for the purpose of discussing the potential acquisition of a condominium unit in the Hotel, which was then being developed by PDV.

56.     Based upon Callan's express and overt representation to Plaintiffs that he was a licensed financial advisor, Plaintiffs provided Callan with an overview of their finances, revealed to him the fact that they did not qualify as accredited investors under applicable Securities and Exchange Commission regulations, and estimated the amount of money they were considering investing in the Hotel.

57.     In or about November 2005, Plaintiffs met with Callan to further discuss their potential acquisition of a condominium unit at the Hotel.

58.     Callan represented that such purchase would serve as both an income producing investment property and also a vacation home for the Plaintiffs' personal enjoyment.

59.     The fact that the condominium unit would be income-producing was of vital import to the Plaintiffs in their decision to purchase a unit in the Hotel.

60.     Callan represented to Plaintiffs that he was not only a licensed financial advisor, but also an officer of PDV, a member of PDV Board, and a member of PDV Executive Committee.

61.     Callan further represented to Plaintiffs that he was actively involved in the Hotel's development, and would continue to be involved in its operations after the Hotel construction was complete.

62.     Callan explained to Plaintiffs that while he was marketing the sale of "condo-apartments," prospective purchasers would actually be purchasing "preferred shares" of stock in PDV that would vest a preferred shareholder with proprietary rights for "the full use and enjoyment and disposal" of a particular unit at the Hotel.  At the same time, the unit would also produce income for its preferred shareholder owners as the unit would be part of the Hotel rental program when not in use by its designated preferred shareholder owner.

63.     In effect, Callan was offering on behalf of PDV to sell to Plaintiffs a combination co-operative/timeshare that would also generate income for Plaintiffs.

64.     Callan further represented to Plaintiffs that the preferred shareholder owners would realize income on their investment through the mandatory placement of their unit into a "rental pool" for seventy-five percent (75%) of the year, through which PDV would rent out units to the public as hotel rooms. Preferred shareholder owners would receive sixty percent (60%) of the net income achieved from this rental pool on a pro rata basis, according to the number of preferred shares held in proportion to the total number of outstanding preferred shares.

65.     Callan expressly and repeatedly represented to Plaintiffs that the rental pool arrangement would result in a significant positive return on their investment on an annual basis, while simultaneously permitting Plaintiffs generous usage of the unit. These representations were intended to be, and were, a major inducement to Plaintiffs' decision to purchase the preferred shares which represented the unit they ultimately acquired.

66.     On November 20, 2005 Callan e-mailed Plaintiffs to provide "financial projections" of the income Plaintiffs purportedly would receive if they purchased a unit  at the Hotel, through the acquisition of preferred PDV shares.   A true and correct copy of this e-mail and the attached financial projections are attached hereto as **Exhibit K**.

67.     In his November 20, 2005 e-mail to Plaintiffs, Callan represented that his financial projections, which supported his earlier assertions that Plaintiffs'

purchase of a unit at the Hotel would simultaneously provide them with an income stream and a vacation home, were "very conservative." Ex. K p. 1.

68. Therein, Callan also noted that if the Plaintiffs opted not to purchase a unit at the Hotel, "[a]nother way to participate in Arenas Del Mar is an investment in my fund [HOF] as my fund is a direct participant in every aspect." Ex. K p. 1.

69. Upon information and belief, Callan drafted and sent this e-mail from his office, which is located in Newtown, Pennsylvania.

70. Upon information and belief, the financial projections attached to this e-mail were prepared by Callan or an employee of Defendants PDV, HOF, Hawk Management and/or HWC at Callan's direction which was given from their common offices in Newtown, Pennsylvania.

71. By e-mail dated December 31, 2005, Callan provided additional investment advice to the Plaintiffs, recommending a proposed investment structure whereby the Plaintiffs would purchase a one-bedroom condominium unit for $275,000, financing such acquisition through a cash payment of $110,000 and borrowing the remaining $165,000 through a loan bearing interest at eight percent (8%). A true and correct copy of this e-mail is attached hereto as **Exhibit L**.

72. Therein, Callan offered to arrange the loan for Plaintiffs. *See* Ex. L ("We are still working out the financing package [with the bank] so I am not sure

how long the amortization will be . . . lets [sic] look at you putting down 40% of $275,000 and borrowing the rest.").

73.    Callan represented to Plaintiffs that the recommended structure was likely to result in a gross income to the Plaintiffs of $15,000 per year, but a net income of only approximately $1,800 per year – after payment of recommended debt service payments on the loan Callan would arrange – from an investment in a one-bedroom unit. *See* Ex. L.

74.    Thus Callan, a purported licensed financial advisor, shockingly recommended an investment in which his own fund, HOF, was already heavily invested, where the projected leveraged return for Plaintiffs was only 1.63 percent. *Id.*

75.    Callan indicated to Plaintiffs in his December 31, 2005 e-mail that the purchaser of a one-bedroom room unit at the Resort would receive fifteen (15) shares of preferred stock in PDV upon payment of the sum of $275,000, or $18,333 per share, while purchasers of a two-bedroom unit would receive twenty-five (25) shares of preferred stock in PDV in exchange for consideration of "over $500,000" or "20,000+ for each share." *Id.*

76.    The above-described representation was knowingly false when made. Two-bedroom units at the Hotel and the twenty-five preferred shares in PDV that

represented such two-bedroom units were in fact sold for $415,000, or only $16,600 per share.

77.     This knowingly false representation contained in Callan's December 31, 2005 e-mail to Plaintiffs was made with the intent that Plaintiffs rely thereupon, and in particular was made in order to induce Plaintiffs to purchase a one-bedroom unit at the Resort.

78.     Callan made this misrepresentation based upon his knowledge of the Plaintiffs' finances and the amount they were willing and able to commit to purchase a unit at the Resort.

79.     Upon information and belief, Callan drafted and sent the December 31, 2005 e-mail from his office in Newtown, Pennsylvania.

80.     Over the ensuing days, Callan continued to discuss with the Plaintiffs their potential purchase of unit 501 at the Hotel (the "Unit"), a one-bedroom condominium, for $275,000.

81.     On January 3, 2006, Callan e-mailed Plaintiffs a Reciprocal Promise of Purchase and Sale (the "PSA"), which included three annexes thereto: (i) a Rental Pool Agreement (the "Rental Pool Agreement"), (ii) Regulations for Use of the Tourism Complex (the "Regulations"), and (iii) Purchase/Sale Contract for Shares (the "PSA Addendum")(the PSA, the Rental Pool Agreement, the Regulations, and the PSA Addendum are collectively referred to hereinafter as the " PSA Contract").

A true and correct copy of the PSA, Rental Pool Agreement, Regulations, and PSA Addendum transmitted from PDV to Plaintiffs are attached hereto as **Exhibit M**, **Exhibit N**, **Exhibit O**, and **Exhibit P** respectively.

82. Upon information and belief, Callan drafted and sent the January 3, 2006 email which transmitted the PSA Contract to Plaintiffs from his office in Newtown, Pennsylvania.

83. Plaintiffs were instructed that the PSA Contract would govern their use and enjoyment of the Unit, and the income to be derived thereby, even after their purchase of the Unit through the purchase of preferred shares in PDV.

84. Callan further represented to Plaintiffs that their usage and income distribution rights set forth in the Rental Pool Agreement and PSA Addendum were contractual obligations of the parties, and thus could not be unilaterally modified by PDV or the PDV Board.

85. Each of the PSA Contract documents constitute representations of the Defendants, and were provided to Plaintiffs in order to induce them to purchase the Unit and with the intention that they rely thereupon.

86. In a second e-mail of January 3, 2006, Callan represented to Plaintiffs that because the Hotel was now "sold out," Plaintiffs could elect to re-sell the Unit after acquisition. A true and correct copy of Callan's second e-mail of January 3, 2006 is attached hereto as **Exhibit Q**.

87.   Callan further represented therein that because he would be raising prices on units in the yet-to-be-constructed second phase of development at the Hotel, the Plaintiffs could likely "flip" the Unit for approximately $349,000, reaping a profit of nearly $75,000. *Id.*

88.   Callan's representations regarding the marketability of the Unit and a reasonable re-sale price for the Unit were knowingly false, and made with the intent that Plaintiffs rely thereupon so as to induce them to purchase the Unit.

89.   Upon information and belief, Callan drafted and sent the second e-mail of January 3, 2006 from his office in Newtown, Pennsylvania.

90.   On or about February 1, 2006, in reliance upon the numerous oral and written representations set forth above which were made by Callan on his own behalf and on behalf of PDV as its officer, Board member and Executive Committee member, as well as by PDV on its own behalf – under the ownership and control of HOF as its primary investor and creditor, which in turn was under the dominion and control of Hawk Management as HOF's general partner and exclusive investment manager, which was controlled by HWC, which was owned by Defendant Callan and non-party Williams – Plaintiffs executed the PSA Contract and paid a cash deposit in the amount of $125,000, which secured their right to "purchase" the Unit for the total sum of $275,000.

91.   PDV countersigned the PSA Contract. *See* Ex. M.

92.     On or about November 30, 2007, Plaintiffs paid the balance of the purchase price, $150,000.00, in cash to PDV.

93.     Plaintiffs borrowed the funds necessary to make the second payment, securing the necessary loan with a second mortgage against their principal residence in reliance upon Callan's representation that his "very conservative" financial projections he provided would allow Plaintiffs to obtain revenue from the investment in the Unit sufficient to cover the debt service on the loan, and to provide Plaintiffs with income for their retirement.

94.     Plaintiffs' purchase of the Unit was memorialized by the issuance of a stock certificate by PDV, which vested Plaintiffs with fifteen (15) shares of preferred stock in PDV (the "Stock Certificate").

95.     The Stock Certificate indicates that five hundred twenty (520) total shares of preferred stock in PDV were issued. Therefore, at the time of issuance, Plaintiffs held approximately three percent (3%) of the preferred equity in PDV.

## The Rental Pool

96.     Plaintiffs' use and enjoyment of the Unit, and the income to which they were entitled by virtue of their ownership of proprietary rights in and to the preferred shares representing the Unit in PDV are governed by the PSA Contract.

97.     In particular, the Rental Pool Agreement provides that all unit owners/preferred shareholders are required to place their unit(s) into a "rental pool"

for a minimum of two hundred seventy four (274) days per year, during which time PDV has the exclusive ability to rent all units in the rental pool on a short-term basis, much like a hotel room. *See* Ex. N.

98. The Rental Pool Agreement further provides the unit owners with the "absolute right" to use their unit(s) for ninety-one (91) days per year. *Id.*

99. These usage rights are subject to the express conditions that (a) only twenty one (21) of those ninety one (91) days could be during the "high season," which is the period from November 30 to May 1 of each year, and (b) for "reasons of maximizing rental income" preferred shareholders will never be permitted to use their units during the period of December 20 through January 5, which time period PDV deemed to be the highest demand period of the calendar year. *Id.*

100. In exchange for placing the Unit in the rental pool and agreeing to the restrictions on the preferred shareholders' right to use their respective units, the Rental Pool Agreement further provides that "Shareholders/Condo-Apartment owners shall receive 60% of the **net income** generated from the rental income of the apartments combined, regardless of the occupancy rate of each individually." Ex. N (emphasis provided).

101. This same paragraph of the Rental Pool Agreement defines "net income" as follows:

> **Net income** is the sum total income calculated after the deduction of credit charges, insurance policies, institutional deductions,

commissions to travel agents and tour operators, costs of discounts as a result of exchanges, municipal and other (government taxes)[sic], as well as the cost to maintain and operate the rented facilities, including operating personnel, maintenance in general, gardeners, service of maids, electric power, water, and telephone, security and repairs, whose cost shall be deducted from the income to be distributed.

Ex. N (emphasis supplied).

102. Significantly, "net income" does not include deductions for debt service, depreciation (which is a tax accounting concept and is thus inapplicable), or capital expenditures/improvements. *See* Ex. N.

103. The term "credit charges" in the Rental Pool Agreement references credit card charges, not debt service.

104. The PSA Addendum, in turn, confirms and substantially restates many of the terms of the Rental Pool Agreement.

105. First, the PSA Addendum confirms that:

the Shareholder/Condo Apartment Owner is guaranteed the personal use of the apartment for 91 days of every calendar year when participating within the rules of the "Rental pool". From those days, the Shareholder/Condo Apartment Owner agrees to occupy his/her condo apartment, [sic] no more than twenty-one (21) days during the months of (November 30th to May 1st) [sic]. The Shareholder/Condo Apartment Owner further agrees that for the purposes of maximizing rental income, the busiest tourism rental weeks/peak weeks from December 20 through January 5 of every season will be reserved exclusively for rental income purposes.

Ex. P.

106. With regard to income from the rental pool, the PSA Addendum states:

> The "Rental Pool" consists of the gross income derived from the rent of all the apartments of the participating Shareholder/Condo Apartment Owner, less the cost of discounts, credit card charges or commissions, institutional costs, travel agency or tourist operator commissions, including other administrative costs such as water, electricity, personnel of operations, maintenance and security personnel. The Shareholder/Condo Apartment Owner shares proportionately 60% of the net income regardless of the occupancy of the apartments. The net income of the Shareholder/Condo Apartment Owner is derived from the "Rental pool", **and will be distributed within sixty days after the closing of the fiscal period with an accounting statement that shall be certified by an independent firm of auditors paid with funds from the Management/Administrative Organization**.

Ex. P (emphasis supplied).

107. Thus, much like the Rental Pool Agreement, the PSA Addendum clearly delineates the permitted deductions for annual net income calculations. *Id.*

108. These deductions do not include debt service payments, depreciation expenses, or capital expenditures. *Id.*

109. In particular, the PSA Addendum's use of the full phrase "credit charge charges" in an identical context confirms that the Rental Pool Agreement's use of the term "credit charges" is, in fact, a reference to credit card charges, and not to debt service payments. *See* Ex. N & P.

110.   Both the Rental Pool Agreement and the PSA Addendum require the Defendants to produce to owners/preferred shareholders PDV's annual financial statements. *Id*.

111.   PDV did produce audited financial statements to Plaintiffs for fiscal years 2007-2010.  True and correct copies of such financial statements are attached hereto as **Exhibit Q**.

112.   PDV's audited financial statements for fiscal years 2011 through the present have not been provided to Plaintiffs.

113.   The failure of PDV to deliver audited financial statements to Plaintiffs for fiscal years 2011 through the present constitutes a breach of the Defendants' obligations under the Rental Pool Agreement and the PSA Addendum.

114.   The aforestated failure constitutes a unique and separate breach of the PSA committed by PDV for each such fiscal year for which no audited financial statements have been delivered.

115.   The financial statements PDV produced to Plaintiffs to date state that PDV achieved no "net income" for each fiscal period reported. *See* Ex. Q.

116.   These statements constitute affirmative representations on the part of PDV and those who own and/or control PDV – namely, HOF, Hawk Management, HWC and Callan – that PDV achieved no "net income" as defined in the Rental Pool Agreement and PSA Addendum.

117. The representations of Defendants that PDV has not achieved positive "net income" are patently false.

118. A review of the financial statements that PDV produced to Plaintiffs for fiscal years 2007 through 2010 reveals that the Defendants knowingly and intentionally violated their obligations under the Rental Pool Agreement and PSA by deducting from the gross income of the rental pool various impermissible categories of costs, including but not limited to debt service, depreciation expense[2] and capital costs, all of which are clearly forbidden under the express definition of "net income" in the PSA Contract.

119. When these improper deductions are removed from the calculation of net income, the true net income of PDV is revealed to be, at a minimum, approximately $900,000 in 2010, $1,300,000 in 2009, $650,000 in 2008, and $100,000 in 2007. *See* Ex. Q.

120. In addition, the text of the Preferred Shareholder Letter indicates that $595,000 of gross income was impermissibly used for capital improvements, thereby further reducing net income from the rental pool reported as reflected in the 2007-2010 financial statements. Ex. I at p. 3.

---

[2] Nor does a reduction in net income for depreciation expense make any logical sense, as the income itself is a specified amount of cash, and that amount cannot depreciate.

121. Indeed, capital improvements are not allowable deductions from gross income when calculating net income as defined in the Rental Pool Agreement and PSA Addendum. *See* Ex. N & P.

122. Based upon the information provided in the 2007-2010 financial statements and the Preferred Shareholder Letter, the true collective net income of PDV in 2007-2010 was approximately $3,550,000, of which sixty percent (60%), or approximately $2,130,000, should have been distributed to owners/preferred shareholders under the Rental Pool Agreement and the PSA Addendum.

123. As such, assuming Plaintiffs' fifteen (15) preferred shares still represented approximately three percent (3%) of PDV's outstanding preferred shares during 2007-2010, Plaintiffs should have received approximately $63,900 in net income distributions in that period.

124. Plaintiffs remained preferred shareholders until 2013.

125. Upon information and belief, similar improper accounting of net income took place during each and every fiscal period between 2011 and 2013, and thus, additional sums are likely due and owing to Plaintiffs for each fiscal year during that time frame.

126. In light of the intentional use of improper accounting practices and other intentional wrongdoing described herein, and based upon a review of the extraordinarily large costs in various categories of PDV's financial statements, it is

likely additional accounting irregularities or improprieties will be revealed upon a complete accounting, resulting in additional sums due and owing by Defendants to Plaintiffs.

127.    The Defendants' use of improper accounting methodologies and the resulting failure of PDV to make distributions to the Plaintiffs which are required under the Rental Pool Agreement and the PSA Addendum constitute breaches of contract with respect to the Plaintiffs' rights under the Rental Pool Agreement and PSA Addendum.

128.    The repeated failures of Defendants to distribute PDV's true net income constitute an independent breaches of contract for each fiscal period in which the Defendants failed to make an accurate distribution to the Plaintiffs of their share of actual net income.

129.    Defendants' use of improper accounting methods formed the basis for their false representations to Plaintiffs that PDV did not achieve positive net income in each fiscal year between 2007 and 2010.

130.    These breaches of contract resulted from a knowing and intentional scheme on the part of the Defendants – initiated, organized and executed by Callan – to defraud Plaintiffs and other preferred shareholders of the income to which they were entitled under the terms of the Rental Pool Agreement and the PSA Addendum.

## The Conversion Scheme

131. On February 15, 2011, the PDV Board issued the Preferred Shareholder Letter.

132. In the Preferred Shareholder Letter, the PDV Board represented to the Plaintiffs and the other preferred shareholders of PDV that the Defendants' failure to pay required distributions under the Rental Pool Agreement and PSA Addendum resulted from "the substantial costs to build the existing property and delays in getting the product to market;" and the fact that "development costs were more than had been anticipated" Ex. I at p. 1-2.

133. Upon information and belief, these statements are and were knowingly false.

134. To the extent that the statements in the Preferred Shareholder Letter referenced above were accurate when made, they constitute an admission on the part of the PDV Board that PDV was undercapitalized and that PDV was impermissibly using "net income" to fill its capital shortfall.

135. These representations were knowingly false because, but for the Defendants' employment of improper accounting methods and the siphoning of profits to fill PDV's capital shortfalls, the rental pool's net income was actually in line with the projections supplied to the Plaintiffs prior to their purchase of the Unit and preferred shares in PDV. *Compare* Ex. I & Q *with* Ex. K.

136.   Based upon Defendants' knowingly false representations, the PDV Board asserted that in order to allow distributions to unit owners/preferred shareholders, and in order to increase the liquidity and value of units/shares in PDV, Plaintiffs and other preferred shareholders must convert their preferred shares to common shares. *See* Ex. I.

137.   Defendants hatched this plan not to enable and provide for payment of the distributions that they were *already* contractually obligated to provide, but instead to defraud Plaintiffs *out of their contractual rights to distributions* under the Rental Pool Agreement or PSA Addendum.

138.   This ill-intended recommendation was also made to curtail the unit usage rights of the preferred shareholders in order to create a larger rental pool, thereby increasing the income generated by the Hotel for PDV.   This increased PDV income would be available to Defendants, under the unfettered dominion and control of Callan, to use for his own benefit, and not for the benefit of Plaintiffs or other preferred shareholders.

139.   Unbeknownst to Plaintiffs and other preferred shareholders, after the preferred shareholders converted their shares to common stock, they would no longer have the contractual right to payment of a specified distribution based upon a specific definition of net income.   Therefore, the increased rental pool would

benefit only the Defendants, and provide absolutely no benefit whatsoever to any converting shareholder.

140. In reliance upon the representations made by Defendants in the February 15, 2011 Preferred Shareholder Letter that the conversion of the preferred shares into common stock was necessary for the financial health of the Hotel, would allow the Defendants to make the distributions that they had heretofore failed to make, would increase the liquidity of the units, and would increase the value of the units, Plaintiffs agreed to convert their PDV shares from preferred to common stock.

141. *Four months later,* on June 21, 2013, the Defendants sent written confirmation that the Plaintiffs' fifteen (15) preferred shares in PDV had been converted to 30,428 common shares in PDV.

142. Plaintiffs did not receive a new stock certificate evidencing their converted common shares until several months thereafter.

143. Accordingly, the conversion of Plaintiffs' shares from preferred shares to common shares (the "Conversion") was not effective until June 21, 2013, at the earliest.

144. Upon information and belief, PDV – through the Hotel – earned equal or greater net income[3] from shareholders' participation in the rental pool after the

_____

[3] As such term is defined in the Rental Pool Agreement and PSA Addendum.

June 2011 conversion than it achieved during the period 2007-2010, and as such an additional $2,130,000 or more should have been distributed to preferred shareholders, including Plaintiffs who unwittingly were forced into the Conversion based on the knowingly false misrepresentations of the Defendants.

145. Thus, an additional $63,900 or more should have been distributed to Plaintiffs during this period.

146. Furthermore, despite the Defendants' representations that the conversion would result in distribution payments to common shareholders, no such distributions have been made to the Plaintiffs to date.

147. Similarly, despite the Defendants' representations that the conversion would increase the value and liquidity of PDV, these shares are completely illiquid and have not increased in value. This is evidenced by Callan's and PDV's refusal of Plaintiffs' demand that Callan and/or PDV repurchase the Unit from them for the $275,000 amount they paid, and Callan's response to Plaintiffs that the Unit's value decreased substantially from its value at purchase.

148. Upon information and belief, Defendant Callan was so intent on capturing the Hotel's profits through the imposition of this conversion scheme that he threatened PDV preferred shareholders who refused to convert their shares into common stock that the preferred shares were rendered "virtually worthless" by the

conversion scheme, and that the only way preferred shareholders could now convert is with Callan's permission.

149. Despite the passage of approximately seven (7) years from the Plaintiffs' purchase of the Unit by and through the purchase of the associated preferred shares, the PDV Board's representation as to the value of PDV shares set forth in the Preferred Shareholder Letter, and the steadily improving financial performance of the Hotel, Defendant Callan declared that $275,000 was not "fair value" for the Unit, and that the Unit is currently worth "far less," thus establishing the decline in value of Plaintiffs' investment in PDV and the Hotel.

150. Callan has further refused to provide a counter offer to repurchase the Unit for any amount of money, thus establishing the illiquidity of the Unit, and of PDV in general.

## COUNT I
### Alter Ego Liability/Piercing the Corporate Veil vs. Defendants

151. Plaintiffs hereby reassert and incorporate by reference the allegations set forth in each of the foregoing paragraphs of their First Amended Complaint as though fully set forth at length herein.

152. The alter ego theory "is applicable when the individual or corporate owner controls the corporation to be pierced and the controlling owner is to be held liable." *Advanced Telephone Systems, Inc. v. Com-Net Professional Mobile Radio, LLC,* 846 A.2d 1264, 1278, 2004 Pa. Super. 100 (2004)

153. Defendant Callan is the President of PDV, a PDV Board member and a PDV Executive Committee member.

154. HWC is the general partner of Hawk Management and is the beneficial owner of all securities that Hawk Management owns.

155. Hawk Management is the general partner and sole investment manager of HOF, which owns the majority of outstanding PDV shares, and through that ownership exerts dominion and control over PDV.

156. Thus Callan, through HWC, and in turn Hawk Management, and in turn HOF, controls the majority of common and preferred shares of PDV.

157. Defendants Callan, HWC, Hawk Management, HOF and PDV are alter-egos of each other. Alter ego liability theory, as described in *Advanced Telephone Systems,* 846 A.2d 1264, 1278, 2004 Pa. Super. 100 (2004), *supra,* applies in precisely this situation, where the individual controlling owner, Callan, is liable for the bad acts of the corporation he controls, PDV.

158. Furthermore, "a court will not hesitate to treat as identical the corporation and the individuals owning all its stocks and assets whenever justice and public policy demand and when the rights of innocent parties are not prejudiced thereby nor the theory of corporate entity made useless." *Good v. Holstein,* 787 A.2d 426, 430 (Pa. Super. 2001) (internal quotations omitted) (quoting *Kellytown Co. v. Williams,* 284 Pa. Super. 613, 426 A.2d 663, 668

(1981)).

159.   Corporate entity theory is not obviated by the imposition of alter-ego liability in this case; nor is any innocent party prejudiced thereby.

160.   Indeed, this case presents a clear-cut misuse of the corporate form by Defendant Callan in order to mask his personal misdeeds, including fraud and breach of contract, and in Pennsylvania the corporate form is disregarded "when the entity is used to defeat public convenience, justify wrong, protect fraud or defend crime." *First Realvest, Inc. v. Avery Builders, Inc.,* 410 Pa. Super. 572, 600 A.2d 601, 604 (1991).

161.   Defendants Callan, HWC, Hawk Management, HOF and PDV are subject to joint and several liability, inasmuch as:

a.    PDV was insufficiently capitalized from its inception (as PDV admits in the Preferred Shareholder Letter; *see* Ex. I);

b.    Upon information and belief, there has been comingling and intermingling of funds and other assets between and among Callan, HOF, HWC and Hawk Management;

c.    Upon information and belief, Defendant Callan has openly admitted that he draws no distinction in ownership or identity between and among HOF and PDV;

d.     PDV has not paid dividends in the regular course of the Hotel's business;

e.     In conducting his business affairs, including but without limitation his interaction with members of the public, Callan intentionally obfuscated whether his actions were taken on his own account or as an officer, director, investment partner, manager, financier, owner or employee of PDV, HOF and/or Hawk Management and/or HWC, such that members of the public were purposefully led to believe that all of these entities and Callan were one and the same;

f.     Callan, HOF, Hawk Management, and HWC all operate out of the same offices in Newtown, Pennsylvania, and the corporate affairs of PDV are also directed from and conducted from these same offices, *see, e.g.,* Ex. J;

g.     Upon information and belief, Defendant Callan has represented to PDV shareholders that he personally controls the possession and release of the shareholders' PDV stock certificates;

h.     Callan, from his offices in Newtown, Pennsylvania, controls the business management of the Hotel, as well as certain day-to-day operations of the Hotel, including but not limited to its targeted culinary themed weeks, which control is touted in local media, *see* Ex. D, E, F & G; and

i.   Callan and HOF openly admit to their managerial leadership of and extensive investment in PDV and its Hotel. *See, e.g.,* Ex. B, H, I, K & L.

162.   The manufactured fiction of PDV, HOF, Hawk Management and HWC as ostensibly separate legal identities is intended principally to assist and enable Callan, PDV, HOF, Hawk Management and HWC in avoiding their respective present and potential legal obligations.

163.   Callan uses the purportedly separate legal identities of PDV, HOF, Hawk Management and HWC as a veil to avoid the legal obligations that he and each of the Defendant entities owes to the public, including to the Plaintiffs herein.

164.   The interests of justice, equality and public policy demand that Callan, HWC, Hawk Management and HOF each be held jointly and severally accountable and legally liable for the wrongful acts and omissions of PDV, notwithstanding the separate sham legal identity of PDV.

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court enter judgment in favor of Plaintiffs and against Defendants Callan, HWC, Hawk Management, HOF and PDV, jointly and severally, in an amount in excess of $275,000, together with prejudgment interest, post-judgment interest, costs and such other relief as the Court deems just and equitable.

## COUNT II
## Breach of Contract vs. Defendants

165. Plaintiffs incorporate the allegations of the preceding paragraphs as if more fully set forth at length herein.

166. The PSA, Rental Pool Agreement and PSA Addendum constitute binding contracts between Plaintiffs and PDV.

167. By virtue of the fact that each of the other Defendants exercise dominion and control over PDV, and do so for the purpose of attempting to shield them from their unlawful activities, PDV is the alter ego of each of the other Defendants, and each are liable for the acts of PDV, which they operate and control.

168. Plaintiffs duly performed all of their obligations, covenants, and promises under the Rental Pool Agreement.

169. PDV is obligated under the Rental Pool Agreement and the PSA Addendum to provide shareholders with annual audited financial statements. *See* Ex. N & P.

170. PDV, under the ownership, dominion and control of co-Defendants Callan, and in turn HWC, and in turn Hawk Management, and in turn HOF, has failed to, and continues to fail to, honor its contractual duty to provide Plaintiffs with audited financial statements of PDV for fiscal years 2011 through 2013, inclusive.

171.   Each of Defendants' failures to produce PDV's audited financial statements constitutes an independent breach of the Rental Pool Agreement and the PSA Addendum for the fiscal years 2011 through 2013, inclusive.

172.   A review of PDV's financial statements that Defendants have produced for fiscal years 2007, 2008, 2009 and 2010 reveals that in calculating net income, the Defendants deducted from the rental pool gross income several categories of expenses not permitted under the Rental Pool Agreement and the PSA Addendum, including debt service, depreciation and capital expenditures.

173.   Defendants' improper accounting formed the basis for Defendants' false representations to Plaintiffs that PDV experienced negative net income for 2007-2010, and that therefore no distributions of PDV's net income were due and owing to Plaintiffs.

174.   The inclusion of impermissible expenses in calculating net income of PDV is a further independent breach of the Rental Pool Agreement for each of the years 2007, 2008, 2009 and 2010.

175.   But for such breaches of contract, the net income of PDV would have been properly reported as positive, and funds should have been available for distribution to Plaintiffs as preferred shareholders of PDV.

176. As a result of such breaches, and the resulting failure of PDV to make the required distributions to Plaintiffs, Plaintiffs have been damaged in an amount not less than $120,000.

177. Such breaches of contract were knowing and intentional, and willful and malicious, and part of an intentional scheme to deprive Plaintiffs of their contractual rights, as a result of which Plaintiffs are entitled to punitive damages.

**WHEREFORE**, Plaintiffs respectfully request that this Court grant judgment in their favor and against the Defendants, jointly and severally, together with the following relief:

a. Compensatory damages;

b. Punitive damages;

c. An accounting of the books and records of the Hotel, PDV and each of the other Defendants as necessary to calculate the net income due and payable to Plaintiffs under the Rental Pool Agreement and the PSA Addendum; and

d. Such other relief as this Court deems just and proper.

## COUNT III
**Breach of Implied Covenant of Good Faith and Fair Dealing vs. Defendants**

178. Plaintiffs incorporate by reference the allegations of the preceding paragraphs as if more fully set forth at length herein.

179. The PSA, Rental Pool Agreement and Rental Pool Addendum constitute binding contracts between Plaintiffs and the Defendants

180. By virtue of the fact that each of the other Defendants exercise dominion and control over PDV, and do so for the purpose of attempting to shield them from their unlawful activities, PDV is the alter ego of each of the other Defendants, and each are liable for the acts of PDV, which they operate and control.

181. It is a fundamental principle of contract law that every contract includes an implied covenant and duty of good faith and fair dealing by and between the parties to the contract.

182. Pennsylvania common law has adopted the principle in RESTATEMENT (SECOND) OF CONTRACTS § 205 that "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *Kaplan v. Cablevision of PA, Inc.,* 448 Pa. Super. 306, 671 A.2d 716, 721–22 (1996).

183. Pennsylvania courts impose a general duty of good faith performance on each party in general commercial contracts. *John B. Conomos, Inc. v. Sun Co., Inc. (R&M),* 831 A.2d 696, 706, 2003 Pa. Super 310 (2003) (citing *Donahue v. Federal Express Corp.,* 753 A.2d 238, 242 (Pa. Super. 2000).

184. By refusing to provide PDV's audited financial statements for fiscal years 2011-2013, by knowingly employing improper accounting methods to

calculate PDV's net income in 2007-2010 and by improperly withholding income distributions that are due and owing to Plaintiffs, the Defendants have materially breached the implied covenant of good faith and fair dealing inherent in the PSA, Rental Pool Agreement and Rental Pool Addendum.

185.  As a direct and proximate result of these breaches, Plaintiffs have suffered damages in an amount in excess of $275,000.

186.  These breaches of the implied covenant of good faith and fair dealing were knowing and intentional, and willful and wanton, and part of an intentional scheme to deprive Plaintiffs of their contractual rights under the PSA, Rental Pool Agreement and Rental Pool Addendum.  As a result, Plaintiffs are entitled to punitive damages.

**WHEREFORE**, Plaintiffs respectfully request that this Court grant judgment in their favor and against the Defendants, jointly and severally, together with the following relief:

    a.  Compensatory damages;

    b.  Punitive damages;

    c.  An accounting of the books and records of the Hotel, PDV and each of the other Defendants as necessary to calculate the net income due and payable to Plaintiffs under the Rental Pool Agreement and the PSA Addendum; and

d. Such other relief as this Court deems just and proper.

## COUNT IV
### Fraud/Misrepresentation vs. Callan and PDV

187. Plaintiffs incorporate by reference the allegations of the preceding paragraphs as if more fully set forth at length herein.

188. As described above in significant detail, Callan represented to Plaintiffs that they would earn a significant positive return on an annual basis from their investment in the Unit through their ownership of preferred shares.

189. Callan represented that, based upon his "very conservative" financial projections, the Plaintiffs would achieve a gross income distribution from the Rental Pool Agreement sufficient to pay debt service on a loan used to finance a portion of the purchase price of the Unit, with additional income remaining from the distribution which would create a positive annual net income for Plaintiffs from their purchase of the Unit.

190. To date, despite Callan's knowing misrepresentations, no distributions whatsoever have been made by PDV to the Plaintiffs.

191. PDV's refusal to make net income distributions was based upon the Defendants' fraudulent position that PDV achieved no positive net income (as that term is defined in the Rental Pool Agreement and PSA Addendum) at any point while the Plaintiffs owned the preferred shares and/or the Unit.

192.   Each of these representations were and are knowingly false, and in fact, during the period 2007 through 2010, PDV actually reaped collective net income of approximately $3,750,000.

193.   Upon information and belief, PDV achieved similar actual net income between 2011 and the present.

194.   PDV falsely represented that it did not achieve a positive net income in 2007-2010 with knowledge of the falsity of these representations, with reckless disregard as to the accuracy of these representations, or under circumstances in which Defendants knew or should have known of the falsity of these representations.

195.   PDV intended Plaintiffs to rely on these false representations.

196.   Plaintiffs reasonably relied on these misrepresentations to their extreme detriment.

197.   In addition, because PDV intended to employ improper accounting methodologies prior to Callan's provision of the "very conservative" financial projections to Plaintiffs, Callan's knowing misrepresentations were likewise false, and were made with the intention that the Plaintiffs rely upon them.

198.   The Plaintiffs did, in fact, rely on Callan's fraudulent misrepresentations in making their decision to purchase the preferred shares and the Unit.

199.  As a direct result of Defendants' actions, Plaintiffs have suffered damages in excess of $275,000.

200.  Plaintiffs had no reason to be aware of the fraud perpetrated by PDV and Callan and described hereinabove until after the finalization of the conversion of their PDV stock from preferred shares to common shares, which finalization occurred upon issuance of the PDV common stock certificate on or about June 15, 2013.

**WHEREFORE**, Plaintiffs respectfully request that this Court grant judgment in his favor and against PDV and Callan, jointly and severally, together with the following relief:

a.  Compensatory damages;

b.  An accounting of the books and records of the Hotel, PDV and each of the other Defendants as necessary to calculate the Net Income due and payable to Plaintiffs under the Rental Pool Agreement;

c.  Punitive damages; and

d.  Such other relief as this Court deems just and proper.

### COUNT V
### Fraud/Misrepresentation vs. Defendants

201.  Plaintiffs incorporate by reference the allegations of the preceding paragraphs as if more fully set forth at length herein.

202. Defendant PDV – which is controlled by the PDV Board and its President, Callan, and which is owned by HOF, which in turn is controlled by Hawk Management, which in turn is controlled by HWC, which in turn is owned by Callan – represented to Plaintiffs that the conversion of their preferred shares of PDV stock to common shares was necessary for the financial well-being of the Resort, would permit PDV to finally make distributions to Plaintiffs, and would increase the liquidity and value of the Unit.

203. Each of these representations was knowingly false when made.

204. Instead, PDV has actually achieved a positive net income (as that term is defined in the Rental Pool Agreement and PSA Addendum) from operation of the Rental Pool in each of 2007, 2008, 2009 and 2010 – and likely also in 2011, 2012 and 2013.

205. In fact, upon information and belief, Defendant Callan was so intent on capturing the Hotel's income through imposition of his conversion scheme on PDV's preferred shareholders, that he has represented to preferred shareholders who refused to convert their preferred PDV stock that the preferred shares are now "virtually worthless;" Callan has further stated that remaining preferred PDV shareholders can only convert their shares to common stock if Callan allows it.

206. The Defendants concocted the conversion scheme in an attempt to relieve themselves of the contractual obligation to pay distributions to the Plaintiffs

and other preferred shareholders, and to defraud Plaintiffs of their rights under the Rental Pool Agreement and PSA Addendum, including their right to annual income distributions.

207.   Defendants made these representations with knowledge of their falsity, with reckless disregard as to their accuracy, or under circumstances in which Defendants knew or should have known of their falsity.

208.   Defendants intended Plaintiffs to rely on these false representations.

209.   Unbeknown to Plaintiffs, Defendants' representations were false, and Plaintiffs reasonably relied on these representations in their decision to convert their preferred shares of PDV stock to common shares, to their extreme detriment.

210.   As a direct result of Defendants' actions, Plaintiffs have suffered damages in excess of $275,000.

211.   Plaintiffs had no reason to be aware of the fraud perpetrated by PDV and Callan and described hereinabove until after the finalization of the conversion of their PDV stock from preferred shares to common shares, which finalization occurred upon issuance of the PDV common stock certificate on or about June 15, 2013.

**WHEREFORE**, Plaintiffs respectfully request that this Court grant judgment in their favor and against Callan, HWC, Hawk Management and HOF, jointly and severally, together with the following relief:

a. Compensatory damages;

b. An accounting of the books and records of the Hotel, PDV and each of the other Defendants as necessary to calculate the Net Income due and payable to Plaintiffs under the Rental Pool Agreement;

c. Punitive damages; and

d. Such other relief as this Court deems just and proper.

**COUNT VI**
**Tortious Interference with Contract vs.**
**Callan, HOF, Hawk Management and HWC**

212. Plaintiffs incorporate by reference the allegations of the preceding paragraphs as if more fully set forth at length herein.

213. Defendants HOF, Hawk Management, HWC and Callan were aware of Plaintiffs' ownership of the preferred shares and the Unit, and specifically of their entry into the Rental Pool Agreement and the PSA Addendum.

214. By causing PDV to withhold contractually obligated net income distributions from preferred shareholders, these Defendants have improperly and without justification, privilege, or excuse, intentionally and knowingly interfered with Plaintiffs contracts with PDV – the Rental Pool Agreement and the PSA Addendum – and induced or otherwise caused PDV to breach these contracts.

215. By perpetrating the conversion scheme, these Defendants have improperly and without justification, privilege, or excuse, intentionally and

knowingly interfered with Plaintiffs' binding contractual agreements with PDV by making false and fraudulent representations in order to intentionally induce the Plaintiffs to forego the benefits of ownership of preferred shares in PDV in exchange for common shares with far less value and no contractual distribution rights.

216. As a direct result of these Defendants' conduct, Plaintiffs have suffered damages in excess of $275,000.

WHEREFORE, Plaintiffs respectfully request that this Court grant judgment in their favor and against Callan, HWC, Hawk Management and HOF, jointly and severally, together with the following relief:

    a. Compensatory damages;

    b. An accounting of the books and records of the Resort, PDV and each of the other Defendants as necessary to calculate the Net Income due and payable to Plaintiffs under the Rental Pool Agreement;

    c. Punitive damages; and

    d. Such other relief as this Court deems just and proper.

**COUNT VII**
**Fraud in the Inducement vs. Defendants**

217. Plaintiffs incorporate by reference the allegations of the preceding paragraphs as if more fully set forth at length herein.

218. Prior to Plaintiffs' purchase of the Unit by and through their purchase of the preferred shares in PDV, PDV and Callan represented that Plaintiffs would

receive their pro rata share of sixty percent (60%) of the net income of the Hotel from which they would earn a return on their investment on an annual basis, based upon Callan's "very conservative" projections.

219. To the extent PDV represented that has not earned a positive net income in the nearly ten (10) years since Plaintiffs purchased the Unit – even though such failure is solely attributable to Defendants' intentional and fraudulent manipulation of PDV's accounting – these representations were knowingly false when made.

220. These knowingly false representations were material to Plaintiffs' decision to purchase the preferred shares representing the Unit and their decisions to purchase the Unit and enter into the Rental Pool Agreement and PSA Addendum.

221. But for the material misrepresentations detailed above, Plaintiffs would not have purchased the preferred shares representing the Unit or entered into the Rental Pool Agreement or the PSA Addendum.

222. Plaintiffs reasonably and justifiably relied upon the Defendants' knowingly false representations in deciding to purchase the preferred shares representing the Unit and in entering into the Rental Pool Agreement with PDV. But for the Defendants' knowingly false representations, the Plaintiffs never would

have purchased the preferred shares that represented the Unit, nor would they have entered into the PSA Contract.

223.  As a direct and proximate result of his reliance on the misrepresentations made by Defendants, Plaintiffs have been substantially damaged.

224.  Plaintiffs had no reason to be aware that PDV and Callan fraudulently induced them to purchase the Unit until after the finalization of the conversion of their PDV stock from preferred shares to common shares, which finalization occurred upon issuance of the PDV common stock certificate on or about June 15, 2013.

WHEREFORE, Plaintiffs respectfully demand judgment in their favor and against each of the Defendants, jointly and severally, for compensatory damages, together with interest and costs, including reasonable attorneys' fees and expenses (as allowable by law), or in the alternative, for rescission of their purchase of the shares representing the Unit, repayment of the purchase price therefor in full, together with reasonable interest thereon for the ten (10) year period of their ownership of the Unit and such further relief as this Court deems just and appropriate.

<u>COUNT VIII</u>
**Fraud in the Inducement vs. Defendants**

225.  Plaintiffs incorporate by reference the allegations of the preceding paragraphs as if more fully set forth at length herein.

226.  "Under Pennsylvania law, the elements of fraud in the inducement are as follows: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance. *Partners Coffee Co., LLC v. Oceana Services and Products Co.,* 700 F. Supp. 2d 720, 727 (W.D. Pa. 2010) (applying Pennsylvania law and citing *Eigen v. Textron Lycoming Reciprocating Engine Div.,* 874 A.2d 1179, 1185 (Pa. Super. Ct. 2005)).

227.  Through the Preferred Shareholder Letter, PDV– which is controlled by the PDV Board and its President, Callan, and which is owned by HOF, which in turn is controlled by Hawk Management, which in turn is controlled by HWC, which in turn is owned by Callan[4] – represented to Plaintiffs that their conversion of preferred shares of PDV stock to common shares was necessary for the financial

---

[4] Further, upon information and belief and as discussed *supra*, Defendant Callan has openly disclosed to PDV shareholders that he draws no distinction in ownership or identity between PDV, HOF and himself.

well-being of PDV, would allow PDV to make distributions to Plaintiffs, and would increase the liquidity and value of the Unit.

228.    These representations were knowingly false when made.

229.    These knowingly false representations were material to Plaintiffs' decision to convert their preferred shares in PDV to common shares.

230.    But for the material misrepresentations set forth above, Plaintiffs would not have participated in and agreed to Defendants' conversion scheme.

231.    Plaintiffs reasonably and justifiably relied upon the Defendants' false representations in deciding to participate in and agree to Defendants' conversion scheme.   But for the Defendants' knowingly false representations, the Plaintiffs never would have converted their preferred PDV shares into common stock.

232.    As a direct and proximate result of Plaintiffs reliance on the misrepresentations made by Defendants, Plaintiffs have been damaged.

233.    Plaintiffs had no reason to be aware that PDV and Callan fraudulently induced them to convert their preferred PDV shares to common stock until after the finalization of the conversion of their PDV stock from preferred shares to common shares, which finalization occurred upon issuance of the PDV common stock certificate on or about June 15, 2013.

WHEREFORE, Plaintiffs respectfully demands judgment in their favor and against each of the Defendants, jointly and severally, for compensatory damages,

together with interest and costs, including reasonable attorneys' fees and expenses (as allowable by law), or in the alternative, for rescission of his purchase of the shares representing the Unit and repayment of the full purchase price, together with reasonable interest thereon for the ten (10) year period of their ownership of the Unit, and such further relief as this Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs demands a jury on all issues so triable.

Respectfully submitted,

**SILVERANG, DONOHOE,
ROSENZWEIG & HALTZMAN, LLC**

Dated: November 4, 2014          By: _____

Philip S. Rosenzweig, Esquire
Attorney ID. No. 62461
595 E. Lancaster Avenue, Suite 203
St. Davids, PA 19087
(610) 263-0115

*Attorneys for Plaintiffs*
*Richard Kreibich and Susan Kreibich*

## Exhibits

A     11/1/04 HOF Confidential Private Placement Memorandum (cover, vii, 5, 14-16, 26, )

B     Hawk Opportunity Fund April 1, 2009 Executive Summary of Investment Portfolio (1, 8)

C     Declaration of David Callan

D     "Culinary Tourism" sub-page, Arenas Del Mar webpage

E     thetowndish.com, Chester County edition, August 13, 2014 entitled *Chester County Heads to Arenas Del Mar for Costa Rica Beer Week*

F     June 24, 2013 article in *Philadelphia Business Journal,* "Chefs will give Philly flavor to tropical resort"

G     April 4, 2013 article on mediakitty.com

H     HOF December 1, 2010 self-authored article

I     February 15, 2011 Preferred Shareholder Letter

J     Exchange Form

K     November 20, 2005 Callan e-mail to Plaintiffs

L     December 31, 2005 Callan e-mail to Plaintiffs

M     PSA

N     Rental Pool Agreement

O     Regulations

P     PSA Addendum

Q     PDV 2007-2010 audited financial statements

EXHIBIT "A"

EXHIBIT "A"

*Memorandum Number:* _____

---

**Confidential Private Placement Memorandum**

---

**November 1, 2004**

# Hawk Opportunity Fund L.P.

**A Delaware Limited Partnership**
**A Private Offering of Limited Partnership Interests**

Minimum Subscription: $250,000

GENERAL PARTNER: Hawk Management L.P.

# DIRECTORY

**General Partner:**

    Hawk Management L.P.
159 N. State Street
Newtown, PA  18940

**Counsel:**

    Goulston & Storrs, p.c.
400 Atlantic Avenue
Boston, MA  02110-3333

**Auditors**

    Eisner LLP
750 Third Avenue
New York, NY  10017

Prospective investors should review carefully the discussion under the caption "INVESTMENT CONSIDERATIONS AND RISK FACTORS" contained herein. An investment in the Fund should only be made by investors who understand the nature of the investment, do not require liquidity in the investment and can bear the economic risk of an entire loss of their investment.

**General Partner**

Hawk Management L.P., a Delaware limited partnership, will act as the general partner (the "**General Partner**" or "**Hawk**") to the Fund. The General Partner has full and exclusive discretionary authority and responsibility to manage the day-to-day operations of the Fund and to invest and reinvest its assets. Hawk will provide investment management services to the Fund.

**Placement Agent(s)**

The Fund may, in the sole discretion of the General Partner, appoint one or more brokers or placement agents to assist in the placement of Interests (each a "**Placement Agent**").

**Eligible Investors**

Partners must be sophisticated persons who understand the nature of the investment, do not require liquidity in their investment in the Fund and can bear the economic risks of the investment, including the loss of the entire investment. Each Partner is responsible for determining if an investment in the Fund of the size contemplated is appropriate or suitable for that Partner.

The Fund is offering Interests only to prospective Partners who are (a) "accredited investors" within the meaning of Rule 501(a) of Regulation D under the Securities Act of 1933, as amended (the "**Securities Act**"), and (b) "qualified clients" as defined in Rule 205-3 under the Investment Advisers Act of 1940, as amended (the "**Advisers Act**"). Partners meeting those requirements are referred to herein as "**Eligible Investors.**"

**Minimum Investment**

The minimum initial investment, or Capital Contribution (as defined herein), by each Partner in the Fund is $250,000, with greater amounts in increments of $10,000 (or such other amounts as the General Partner may determine from time to time),

# THE FUND

## Organization

Hawk Opportunity Fund L.P. (the **"Fund"**), is a Delaware limited partnership formed on August 13, 2004, providing limited liability in accordance with Delaware law for all investors of the Fund (the **"Partners,"** each a **"Partner"**). This Memorandum relates to the offering of limited partnership interests in the Fund (the **"Interests"**). The Fund intends to commence operations on November 1, 2004.

Capitalized terms not otherwise defined in this Memorandum have the respective meanings ascribed to them in the limited partnership agreement (**"Limited Partnership Agreement"**). The General Partner (as defined herein) may, in its sole discretion, amend, restate or supplement this Memorandum from time to time, subject to the notice provisions described below with respect to modifying the Fund's investment objective.

## Nature of Interests

The Interests offered hereby consist of limited partnership interests in the Fund. Delaware law provides limited liability for the Limited Partners.

Limited Partners generally will have no voting rights, except for limited voting rights with respect to the dissolution of the Fund, as described herein. Limited Partners in the Fund do not have any right to participate in the management and control of the Fund except to a very limited extent as specifically set forth in the Limited Partnership Agreement. Management and control of the business and operations of the Fund are vested exclusively in the General Partner.

## INVESTMENT APPROACH

### Investment Objective

The Fund's investment objective is to obtain the highest total return consistent with moderate risk by investing in a portfolio consisting mainly of equity and debt securities of undervalued companies. There can be no assurance that the Fund will achieve its investment objective or not lose money.

### Investment Strategies

The Fund seeks to achieve its investment objective by investing for opportunistic growth primarily in undervalued securities, such as stocks or bonds of companies that are distressed, bankrupt, in the midst of a restructuring, or simply out of favor, and may pursue its objective by using components of dividends, interest and capital gains.

The General Partner uses a bottom-up approach to stock selection. In other words, the General Partner looks for securities of companies which it believes are undervalued, by comparing the company's stock price with its book value, cash flow, break up value, its peer group multiple or its "hidden" assets value. However, the General Partner may also consider the

macroeconomic picture as it relates to certain industries and from time to time may elect to invest in exchange traded funds or other mutual fund surrogates that provide increased investment diversification within an industry.

The General Partner's investment approach utilizes a broad range of securities and financial instruments available in a particular industry. The content and range of the Fund's investments may vary greatly and frequently depending on the judgment of the General Partner. Strategic judgments on the mix of investments are based on evaluation disciplines and tools for analysis, which have been or are being developed by the General Partner. There can be no assurance that the General Partner's judgment will result in profitable investments by the Fund.

The Fund has maximum flexibility to invest in a wide range of instruments, including listed and unlisted equities, debt securities, bridge loans in public or private companies and interests in other funds (including funds advised by the General Partner or its Affiliates). When investing in other funds advised by the General Partner or its Affiliates, there will be no layering of advisory fees and no imposition of sales charges. This will be ensured through the use of waivers, rebates or the like. Certain ordinary operating expenses may be duplicated. The Fund may also retain amounts in cash or cash equivalents, pending reinvestment, if this is considered appropriate to the investment objective.

In addition, the Fund intends to invest in the securities of bankrupt and distressed companies, and may invest in municipal or public bankruptcies, liquidations and restructurings. The Fund may also invest in commodities, oil and gas, gold, silver or other precious metals, if, in the opinion of the General Partner, they are currently undervalued. In addition, the Fund may invest in a company's debt and short its equity, or do the inverse.

The Fund may also seek to achieve its investment objective by using alternative investment strategies. These investment strategies may include purchasing options, warrants and other derivative instruments, short selling securities, and using leverage, or various bond strategies, including buying bonds ahead of an anticipated call or sinking fund, restructurings, conversions or swaps. Derivative instruments may be exchange traded or purchased over the counter and may be used for hedging and to manage short term volatility or speculation on market direction. The Fund may also use other hedging techniques. For example, the Fund may from time to time short sell a bond of one maturity and buy a similar bond with a different maturity. Instead of selling short a particular security, the General Partner may determine that an entire industry is overvalued, and use inversely-correlated funds or short sell an index in that industry. The Fund may use risk arbitrage if the General Partner believes it may offer a compelling rate of return, and may borrow in the course of its regular operations. The General Partner is not required to use these strategies, and may not use them at all.

Compared to the broader market indices, the Fund may invest a relatively large portion of its assets in a small number of issuers. The Fund may also invest in securities that the General Partner considers extremely illiquid or "private" securities ("**Private Placement Investments**"), such as venture capital, private equities, over-the-counter customized derivatives, and may make private investments in public companies ("**PIPEs**"). The Fund has the authority to hold such Private Placement Investments in "Private Placement Accounts." Only persons who are Limited Partners at the time the Fund invests in a Private Placement Investment will be able to participate

in such investment. Not more than 20% of the Fund's total assets will be invested in Private Placement Investments, and not more than 5% of the Fund's total assets will be invested in a single Private Placement Investment. Such percentage limitations shall be evaluated at the time of investment.

## Use of Proceeds; Cash Equivalents

The General Partner expects that the Fund may hold cash or invest in cash equivalents. In the event that the General Partner believes in its sole judgment that there is not sufficiently good value in securities suitable for investment of the Fund's capital, all such capital may be held in cash or cash equivalents.

## INVESTMENT CONSIDERATIONS AND RISK FACTORS

No guarantee or representation is made that the Fund will achieve its investment objective. An investment in the Fund involves investment considerations and risk factors which prospective investors should consider before subscribing. All securities investments involve the risk of loss of capital. The securities and other instruments to be purchased and traded by the Fund and the investment techniques and strategies to be employed by the General Partner may increase this risk. There is no assurance that the General Partner's judgment will result in profitable investments by the Fund, nor is there any assurance that the Fund will not incur losses.

*There are substantial risks of investing in the Fund that prospective investors should consider carefully. Certain of the characteristics and risks of certain potential portfolio securities of the Fund and certain investment techniques the General Partner may utilize in managing the Fund's investments are set forth below. Given the breadth of the possible investments and techniques in which the Fund may engage, not all possible ones are described. Other risks that apply to the organization and operation of the Fund and its principals also are set forth. These discussions are not intended to describe every potential investment or other risk of investing in the Fund, and potential investors must make their own evaluation of the risk of investing in the Fund. Before they make a decision to invest in the Fund, potential investors also are encouraged to consult with their own financial, legal, tax and other advisors about the risks of investing in the Fund.*

## Certain Investment and Trading Risks

**Investment and Trading Risks in General** - All securities and financial instrument investments present a risk of loss of capital. The use of such investment techniques as options, margins, short sales, futures, and leverage may, in certain circumstances, increase losses in the Fund.

**Equity Securities** - The Fund is subject to risks associated with investing in equity securities, including market risk, issuer risk, price volatility risk and market trends risk. The Fund's ability to achieve its investment objective may be affected by the risks attendant to any investment in equity securities. The Fund may invest in equity securities without regard to market capitalization, and the Fund may invest a substantial portion of its assets in securities for which there is no market.

## Other Risks of Investing in the Fund

**Lack of Operating History** - The Fund is newly formed and has no operating history or record of performance. There is no assurance the Fund will achieve its investment objective. Any past investment performance of the General Partner or its Affiliates known to potential investors cannot be construed as any indication of the future performance or results of an investment in the Fund.

**Reliance on Key Individuals** - The success of the Fund is significantly dependent upon the expertise of David S. Callan, Edgar Jay House and Richard Scott Williams. If for any reason the services of Messrs. Callan, House or Williams were not to be available to the Fund in the future, this could adversely affect the Fund's performance.

**Lack of Regulatory Oversight** - The Fund will not be registered or subject to regulation as a registered investment company under the Investment Company Act. As a result, the Fund will not be subject to the provisions of the Investment Company Act that apply to registered investment companies. These provisions, among other things, place restrictions on certain investment practices, such as short sales and leverage, require investment companies to have a certain percentage of disinterested directors, require securities held in custody for the account of the investment company to be segregated from the securities of any other person and marked to identify clearly the securities as the property of the investment company, and regulate the relationship between the investment company and its investment adviser and its affiliates.

**Special Allocation** - The General Partner will receive a Special Allocation (as defined herein) based upon the performance of the Fund, which may encourage the General Partner to make investments for the Fund that could involve more risk than would be the case if the Special Allocation were not available. In addition, because the Special Allocation is calculated based on unrealized as well as realized gains, it could be payable by the Fund even if the Fund and its investors were not to subsequently have any realized gains. Moreover, the General Partner is expected to provide valuations of the Fund's assets, on which the Management Fee and Special Allocation are based.

**Lack of Liquidity** - The Interests are subject to restrictions on transferability and resale, and may not be transferred or resold except as permitted under the Limited Partnership Agreement, the Securities Act and other applicable securities laws, pursuant to registration thereunder or an exemption therefrom. There is no public market for the Interests and no such market is expected to develop in the future. Accordingly, Interests should only be acquired by Partners willing and able to commit their funds for an appreciable period of time and who have no need for liquidity of the amount they invest in the Fund.

**Conflicts of Interest; Other Activities of the General Partner** - The General Partner and its Affiliates may invest for their own accounts and for the accounts of clients in various instruments that are senior to, rank in parity with, or represent interests that are different from or adverse to the instruments owned by the Fund. Furthermore, the General Partner and its Affiliates may make investment decisions for their own accounts and for the accounts of others, including other funds, that may be different from those made by the General Partner and its Affiliates on behalf of the Fund. The General Partner may at certain times be simultaneously

seeking to purchase or sell investments from the Fund and sell or purchase the same investment for a similar entity, including other funds, for which it serves as asset manager now or in the future, or for its other clients or affiliates. The General Partner may aggregate trades and cause the Fund to receive the average price. In addition, the General Partner and its Affiliates may buy securities from or sell securities to the Fund to the extent permitted by applicable law. These other relationships may result in restrictions on certain transactions by the Fund and otherwise create potential conflicts of interest for the General Partner.

The General Partner and its Affiliates may invest directly and on behalf of other clients in companies in the Fund's portfolio. The General Partner and its Affiliates may provide management services or otherwise be involved in the management of those companies. The General Partner and its Affiliates may own and may purchase securities in which the Fund invests and may retain or dispose of such securities without regard to the Fund's holdings.

In addition, the General Partner and its Affiliates may work on a consulting basis through separate agreements with companies which are in the Fund's portfolio. The General Partner and its Affiliates would expect to make profits on the consulting services provided to the companies in the Fund's portfolio. The General Partner and its Affiliates may also receive investment banking fees from companies in which the Fund might invest. Due to these arrangements the interests of the General Partner and its Affiliates may diverge from those of the Fund and the companies in the Fund's portfolio.

The General Partner and its Affiliates may make profits on various arrangements with the companies in the Fund's portfolio while the Fund may be losing money.

Although the principals and employees of the General Partner will devote as much time to the management and operation of the Fund as the General Partner deems appropriate, they may have conflicts in allocating their time and services among the Fund and the other accounts advised by the General Partner and its Affiliates. In addition, in connection with its other business activities, the General Partner may acquire material non-public or confidential information that may restrict the General Partner from trading in the securities to which that information relates to the disadvantage of its clients including the Fund, or otherwise using such information for the benefits of its clients or itself.

Conflicts of interest also exist in the structure and operation of the Fund's business. The Management Fee (as defined herein) that the General Partner receives may not have been set by "arm's length" negotiations and may be higher than the fee which another investment adviser may have charged. The General Partner and its Affiliates, as well as client accounts or other funds over which the General Partner or its Affiliates exercise investment discretion, may invest in the Fund, and such investments may represent a substantial amount of the overall assets of the Fund. However, the General Partner is not required to maintain its investment, if any, in the Fund for any minimum period of time nor to maintain any minimum investment in the Fund, and may withdraw any portion or all of its investment in the Fund at any time. The Fund may invest in other funds advised by the General Partner or its Affiliates. This type of investment creates conflicts of interest for the General Partner, which is more likely to make an investment in an affiliated fund than in a comparable unaffiliated one.

**Limited Partners Do Not Participate in Management of the Fund** – Limited Partners shall take no part in the management, conduct or control of the Fund's business. They have no right or authority to act for the Fund or to vote on matters other than the matters set forth in the Limited Partnership Agreement or as required by applicable law.

## MANAGEMENT

### Manager

The General Partner of the Fund is Hawk Management L.P., a Delaware limited partnership (the **"General Partner"** or **"Hawk"**). The General Partner has full and exclusive discretionary authority and responsibility to manage the day-to-day operations of the Fund and to invest and reinvest its assets. The General Partner has the authority to sell, exchange, or otherwise transfer all or any portion of the assets of the Fund, and to delegate all, or any such part as it deems appropriate, of its discretionary management authority and responsibility. None of the foregoing actions requires the approval of any Partner.

The General Partner will act as the investment adviser to the Fund and will determine what securities shall be purchased for the Fund, what portfolio securities shall be held or sold by the Fund and what portion of the Fund's assets, if any, shall be held uninvested.

The actual management of the Fund's assets and operations will be conducted by Hawk. Hawk's general partner is HWC LLC, and its members, Edgar Jay House, Richard Scott Williams and David S. Callan, will be responsible for all operations and investment decisions made by the General Partner, however Hawk may change a portfolio manager of the Fund at any time without notice. Together, the General Partner's members have over 55 years' experience in the securities business. The following is some brief information on each member:

### Edgar Jay House

BA, Yale University, 1975

Employment History:

1993 – Present: President & Treasurer, *Darwin, Inc.*, Newtown, Pennsylvania

1982 – Present: Principal, *House & Company, Inc.*, Newtown, Pennsylvania

1978 – 1982: Vice President/Account Supervisor, *Arthur Hecht & Partners*, New York, New York

### Richard Scott Williams, Portfolio Manager

BA, University of Oklahoma, 1975

Employment History:

2002 – Present: Managing Director, *Philadelphia Brokerage Corp.*, Wayne, Pennsylvania

1992 – 2002: Managing Director, *Investec (successor to Pennsylvania Merchant Group),* West Conshohocken, Pennsylvania

1989 – 1992: Senior Vice President, Assistant Branch Manager, Sales Manager, *Prudential Bache Securities,* Jenkintown, Pennsylvania

1984 – 1989: Vice President, Assistant Branch Manager, Sales Manager, *Drexel, Burnham, Lambert,* Jenkintown, Pennsylvania

1978 – 1984: Registered Representative, *AG Edwards and Sons,* Abington, Pennsylvania

### David S. Callan, Portfolio Manager

BS, Indiana University of Pennsylvania, 1987

1999 – Present: President, Chief Executive Officer, Director, *Polar Capital Management, Inc.*

1997 – 1999: Vice President, *Boenning and Scattergood,* West Conshohocken, Pennsylvania

1993 – 1997:Vice President, *Pennsylvania Merchant Group,* West Conshohocken, Pennsylvania

1989 – 1993: Vice President *Prudential Bache Securities,* Jenkintown, Pennsylvania

1987 – 1989: Vice President, *Drexel, Burnham, Lambert,* Jenkintown, Pennsylvania

The activities of the General Partner are subject always to the provisions of the Limited Partnership Agreement and to the Fund's investment objective, policies and restrictions, and subject, further, to such policies and instructions as the General Partner may from time to time establish for the Fund.

In conducting its research activities, the General Partner utilizes certain reports and statistics from a wide variety of sources, including brokers and dealers who may execute portfolio transactions for the Fund and for other clients of the General Partner, but conclusions are based primarily on the General Partner's own investigations and critical analyses.

Certain investments may be appropriate for the Fund and also for other clients advised by the General Partner. Investment decisions for the Fund and for such other clients are made with a view to achieving their respective investment objectives and after consideration of such factors as their current holdings, availability of cash for investment and the size of their investments generally. Frequently, a particular security may be bought or sold for only the Fund or only one client or in different amounts and at different times for more than one but less than all clients, including the Fund. Likewise, a particular security may be bought for the Fund or one or more clients when one or more other clients or the Fund are selling the security. In addition, purchases or sales of the same security may be made for two or more clients, including the Fund, on the same date. In such event, such transactions will be allocated among the Fund and client(s) in a manner believed by the General Partner to be equitable to each. Purchase and sale orders for the Fund may be combined with those of other clients of the General Partner in the interest of most favorable net results to the Fund. In effecting transactions, it may not always be possible, or consistent with the

investment objectives of the various persons described above and of the Fund, to take or liquidate the same investment positions at the same time or at the same prices.

Many of the investment changes in the Fund will be made at prices different from those prevailing at the time they may be reflected in a report to the Partners. These transactions will reflect investment decisions made by the General Partner in light of the objective and policies of the Fund, and such factors as its other portfolio holdings and tax considerations, and should not be construed as recommendations for similar action by other investors.

Under the Limited Partnership Agreement, the General Partner (which includes, for this purpose, its principals, officers, partners, members, employees and other agents) will not be liable to the Fund or to its Partners for any loss suffered by the Fund or its Partners which arises out of any action or inaction of the General Partner, except a loss resulting from the gross negligence, willful default, fraud or dishonesty of the General Partner in its performance or non-performance of its obligations or duties under the Limited Partnership Agreement, except as otherwise required by applicable law. In addition, the Fund will indemnify the General Partner to the fullest extent permitted by applicable law against claims and threatened claims except to the extent losses are by reason of the gross negligence, willful default, fraud or dishonesty of the General Partner, except as otherwise required by applicable law, as provided in the Limited Partnership Agreement.

The General Partner may, in its sole discretion, amend, restate or supplement this Memorandum from time to time, subject to the notice requirement described above with respect to modifying the Fund's investment objective.

Any goodwill, intellectual property rights, trademark, trade name or other intangibles or intangible rights associated with either the Hawk name or logo, or the operation of the Fund or the General Partner as a going concern belong solely to the General Partner and are not the property of and will not be for the benefit of the Fund or any of its Partners.

### Placement Agent(s)

The Fund may, in the sole discretion of the General Partner, appoint one or more brokers or placement agents to assist in the placement of Interests (each a **"Placement Agent"**).

## TERMS OF THE OFFERING

### Eligible Investors

Admission as a Limited Partner in the Fund is not open to the general public. Limited Partners must be sophisticated persons who understand the nature of the investment, do not require liquidity in their investment in the Fund and can bear the economic risks of the investment, including the loss of the entire investment. The Fund is not intended as a complete investment program. Each Limited Partner is responsible for determining if an investment in the Fund of the size contemplated is appropriate or suitable for that Limited Partner. The Fund is offering Interests only to prospective Limited Partners who are (a) "accredited investors" within the meaning of Rule 501(a) of Regulation D under the Securities Act, and (b) "qualified clients"

EXHIBIT "B"

EXHIBIT "B"

# Hawk Opportunity Fund



Executive Summary of
Investment Portfolio

April 1, 2009



# Arenas del Mar

Description: Luxury boutique hotel located in Manuel Antonio, Costa Rica (Central Pacific Coast)

The hotel has 38 rooms and is the only luxury beach front hotel located within 45 minutes in either direction of Manuel Antonio.

Investment: HOF currently has a 75% equity ownership in the Hotel along with development rights for phase 2 expansion to 75+ rooms.

www.arenasdelmar.com

# EXHIBIT "C"

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

RICHARD KREIBICH and
SUSAN KREIBICH

    Plaintiff

  v.

PLAYA DULCE VIDA, S.A., et al.

    Defendants

:
:
:
:
:
:
:
:
:
:
:
:

No. 2:14-cv-05102-ER

Civil Action
Jury Trial Demanded

## DECLARATION OF DAVID CALLAN

  I, David Callan, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and state as follows:

  1.  I am over the age of eighteen and make this declaration with the understanding that it is to be used in the above-captioned lawsuit.  All statements contained herein are based on my personal knowledge, and I am fully competent to testify to the facts herein.

  2.  I am the president and a board member of Playa Dulce Vida, S.A ("PDV"), which is sociedad anónima or corporation organized and exiting under the laws of Costa Rica.

  3.  I am authorized to submit this declaration on behalf of PDV.

  4.  PDV owns and operates the Arenas Del Mar Beachfront and Rainforest Resort (the "Resort") located at Manuel Antonio, Quepos, Puntarenas Costa Rica.

  5.  Playa Dulce Vida's principal place of business is located Costa Rica and its registered corporate address is San José, Mata Redonda, Sabana Norte, Las Américas Ave., Torres del Parque building, third floor.

  6.  PDV is neither incorporated nor licensed to do business in the Commonwealth of

1

Pennsylvania.

7.     PDV has never filed any tax returns in Pennsylvania.

8.     PDV has never filed any administrative reports with any Pennsylvania agency or the Pennsylvania department of state.

9.     PDV does not regularly purchase products or supplies within Pennsylvania for use in its business outside Pennsylvania.

10.     PDV owns no land or property within Pennsylvania.

11.     Although PDV advertisements and web site may reach Pennsylvania residents, such advertisements and the web site are not specifically targeted at Pennsylvania residents.

12.     PDV's only contact with Pennsylvania is that in February 2014, shareholders were able to pick up their preferred stock certificates in Newtown, Pennsylvania.

13.     Contrary to the allegations made by in Paragraph 158(e) of the Complaint filed in the above-captioned action, the corporate affairs of PDV are not directed from and conducted from Newtown, Pennsylvania.   All meetings of the PDV's board of directors and executive committee occur in Costa Rica—not in Pennsylvania.

14.     Moreover, contrary to the allegations made in the Complaint filed in the above-captioned action, PDV does not maintain its corporate and official records in Pennsylvania. Instead, PDV maintains its corporate and official records in San José, Costa Rica.

15.     The day-to-day operations of the PDV and are not controlled by either Hawk Management L.P., Hawk Opportunity Fund, L.P. or HWC, LLC, or me in Pennsylvania. Instead, PDV conducts its day-to-day operations in Costa Rica as set forth below.

16.     PDV owns and operates the Arenas Del Mar Beachfront and Rainforest Resort (the "Resort") located at Manuel Antonio, Quepos, Puntarenas Costa Rica.

17.     The day-to-day operations of the Resort are not controlled by either Hawk Management L.P., Hawk Opportunity Fund, L.P. or HWC, LLC, or me in Pennsylvania. Instead, the day-to-day operations of the Resort are conducted in Costa Rica by either the Resort's Costa Rican-based general manager, Jorge Arrieta, or through the Costa Rican-based management company, Cayuga.

18.     Moreover, contrary to the allegations in paragraph 6 of the Amended Complaint, neither R. Scott Williams nor I control or direct the day-to-day operations of PDV or the Resort. Instead, the day-to-day operations of PDV and the Resort are conducted in Costa Rica by either the Resort's Costa Rican-based general manager, Jorge Arrieta, or through the Costa Rican-based management company, Cayuga.

I understand that the foregoing statements are made subject to the penalties of 28 U.S.C. § 1746, relating to unsworn falsification to authorities.

David Callan

Dated:   October 1, 2014

3

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| RICHARD KREIBICH and SUSAN KREIBICH : | |
| : | No. 2:14-cv-05102-ER |
| Plaintiff : | |
| v. : | |
| : | Civil Action |
| PLAYA DULCE VIDA, S.A., et al. : | Jury Trial Demanded |
| : | |
| Defendants : | |

**ORDER**

AND NOW, this _____ day of _____, 2014, upon consideration of the Motion to Dismiss filed by defendants Playa Dulce Vida, S.A., Hawk Management L.P., and HWC, LLC, David Callan, and any response thereto, the Complaint (Doc. 1) is hereby dismissed.

_____
Edwardo C. Robreno
United States District Judge

EXHIBIT "D"

EXHIBIT "D"

{00247877;1}

TAG ARCHIVES: CULINARY TOURISM

# World class chefs descend on Manuel Antonio

Posted on **June 12, 2013**

Last year Dave Callan and Jeremy Allen, the two Philadelphia based co-owners of Arenas Del Mar Beachfront and Rainforest Resort in Manuel Antonio, decided to see what they could do to build on the hotel's reputation for eco-luxury and service.

They decided to introduce a top US-based chef to the area and see what they could create with Costa Rican ingredients. Known for its biodiversity, commitment to sustainability, rainforests, wildlife, beauty and beaches, Costa Rica has not made a name for its food or culinary scene.



— Foodies take note! When you combine world class chefs with world class ingredients incredible things happen.

So, Arenas Del Mar's culinary program has been launched and Philadelphia chefs are benefiting as well as their own clients and food lovers from around the world. Guests can sign up for amazing Costa Rican inspired dining, cooking lessons and time exploring the area and all it has to offer with their favorite chefs.

Contact us to book your Costa Rican culinary adventure

Posted in **Arenas del Mar**, **Culinary Experience**, **Manuel Antonio**, **Tours and Activities** | Tagged **culinary**, **Culinary tourism**, **fine dining costa rica**, **food tourism**, **foodie tour** | **Leave a reply**

# Guest Chef series at Costa Rica's Arenas Del Mar features Philadelphia's top talents

Posted on **May 31, 2013**



**Cheesesteak Casado, anyone?**

*Guest Chef series at Costa Rica's Arenas Del Mar features Philadelphia's top talents*

**May 29, 2013, Manuel Antonio, Costa Rica** – Costa Rican cuisine gets a shake-up this fall, as leading chefs from Philadelphia descend upon Arenas Del Mar Beachfront & Rainforest Resort for the hotel's second *Guest Chef* series.

Drawing on the abundance of exotic, fresh ingredients from Costa Rica's Pacific Coast, Philadelphia's gastronomic superstars will join Arenas Del Mar's skilled kitchen staff to create a vacation experience for foodies and aspiring chefs alike.

"We launched our Guest Chef program in 2012 knowing that the best way to build Costa Rica's culinary reputation was to introduce top chefs from other parts of the world to our local ingredients and dishes," says Hans Pfister, CEO and principle of the Cayuga Collection, a company that manages a number of luxury eco-resorts, hotels and lodges in Central America, including Arenas Del Mar. "It just seems to make sense that a country as bio-diverse as Costa Rica can also grow and produce incredible ingredients, which results in its own noteworthy cuisine."

The roster of culinary talents for the 2013 Guest Chef series includes:

- Sept. 16 – 18: Kevin Sbraga of Sbraga (featured on Bravo's *Top Chef*), accompanied by Christina Rando and Al Sotack of Franklin Mortgage Bar
- Sept. 23 – 25: Josh Lawlor of The Farm and Fisherman